**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE:** | ) |
| | ) |
| **ANTHONY A. GREJDA, d/b/a** | ) |
| **THE MEDICINE SHOPPE,** | ) |
| | ) |
| Debtor | ) |

| | |
|---|---|
| **ANTHONY A. GREJDA,** | ) |
| | ) |
| Movant/appellant, | ) |
| | ) **2:06cv476** |
| v. | ) **Electronic Filing** |
| | ) |
| **MEDICINE SHOPPE INTERNATIONAL,** | ) (Bankruptcy No. 02-33620-BM) |
| **INC. and PHARMACY OPERATIONS** | ) (Re: Doc. Nos. 105, 120, 138 and 153) |
| **INC.,** | ) |
| | ) |
| Respondent/appellee. | ) |

AND

| | |
|---|---|
| **ANTHONY A. GREJDA,** | ) |
| | ) |
| Movant/appellant, | ) |
| | ) **2:06cv522** |
| v. | ) **Electronic Filing** |
| | ) |
| **MEDICINE SHOPPE INTERNATIONAL,** | ) (Bankruptcy No. 02-33620-BM) |
| **INC. and PHARMACY OPERATIONS** | ) (Re: Doc. Nos. 105, 120, 138 and 153) |
| **INC.,** | ) |
| | ) |
| Respondent/appellee. | ) |

## <u>OPINION</u>

In this appeal from a decision of the United States Bankruptcy Court for the Western District of Pennsylvania, appellant, debtor Anthony Grejda's ("Grejda") bankruptcy estate, seeks review of a ruling that awarded appellee, Medicine Shoppe International, Inc. ("MSI"), $4,147,224.00. This award was comprised of two separate amounts stemming from Grejda's operation of two different

pharmacies.

MSI's second amended proof of claim sought two separate awards based on a license agreement between the parties. MSI requested $171,224 in connection with the operation of the Crafton Medicine Shoppe pharmacy ("Medicine Shoppe pharmacy") Grejda operated as a licensee of MSI. Grejda stipulated that he owed this amount. MSI also requested $3,998,819 in connection with Grejda's operation of Today's TDI, Inc. ("TDI"), an internet pharmaceutical corporation located in the basement of the Medicine Shoppe pharmacy. Grejda objected to this component of MSI's proof of claim and challenges on appeal the Bankruptcy Court's determination that MSI was entitled to recover this amount under the license agreement.

### Background

The factual and procedural background of this case are not in dispute. On July 9, 1993, Grejda and MSI entered into a license agreement which permitted Grejda to operate a Medicine Shoppe pharmacy in Crafton, Pennsylvania. Under the terms of this ten year license, MSI agreed not to license another pharmacy within 1.4 miles of Grejda's pharmacy. MSI also agreed to select a geographic area that would minimize competition for Grejda.

In return, Grejda agreed to pay MSI an origination fee and, under § 6.C of the agreement, a continuing license fee equal to 5.5 percent of his Medicine Shoppe pharmacy's monthly net revenues. The term "net revenues" was understood to mean and include (a) the actual gross receipts collected from customers "of the Pharmacy" or third party payors in relation to goods and services provided to those customers, (b) the actual gross receipts collected from any person, whether or not a customer, in connection with sales of goods or services made as a result of any association with or use of the Medicine Shoppe Mark or The Medicine Shoppe system; and (c) any and all other revenues derived through the operation of the Pharmacy.

The license agreement also contained a section pertaining to the management of the store and conflicts of interest. Under § 7.C of the Agreement Grejda or his managing pharmacist were required to devote their full working time and attention to the pharmacy. Also, Grejda was

2

required to exert his best efforts to promote and enhance the business and refrain from engaging in any business or activity that might conflict with his contractual obligations.

Section 7.C also contained a non-compete clause. This clause prohibited Grejda from owning capital stock, a partnership or any other equity interest in any business that offered pharmacy services for the duration of the lease agreement. Grejda was also prohibited from actively participating as an officer, director, or employee of any such company for the life of the license agreement. The license agreement proclaims that without the non-compete clause MSI would be "unable to protect the confidential elements of THE MEDICINE SHOPPE System and achieve an exchange of ideas among [its] licensees if [its] licensees were permitted to hold competitive interests . . ." The license agreement indicates in §14.H that it is to be construed and interpreted according to Missouri law.

Grejda entered into a lease with a third party for the premises of his pharmacy. The lease covered the pharmacy on the first floor and a basement storeroom. This storeroom was accessible from the pharmacy and a seperate entrance behind the building.

Grejda and others incorporated Today's TDI, Inc.("TDI"), on September 24, 1998. TDI was an on-line mail-order pharmacy delivering drugs primarily to HIV/AIDS patients nationwide. TDI's physical operations were conducted from the basement under the Medicine Shoppe pharmacy. TDI did not use the Medicine Shoppe name in any way to promote or enhance its business. It had its own inventory of drugs, its own employees, its own head pharmacist, its own licensing, its own supplies, its own banking accounts, and so forth. In every respect TDI was entirely autonomous from the Medicine Shoppe pharmacy, save the physical structure in which both were operated.

Grejda owned eighty-nine of one hundred shares of TDI. He served as the corporation's treasurer and secretary.

MSI was unaware of TDI's existence until 2002 when state and federal agents raided TDI and the Medicine Shoppe pharmacy. As a result, Grejda was facing multiple criminal charges for

3

activities in connection with his operation of TDI.[1]

Grejda filed a voluntary Chapter 11 petition in December of 2002.  On June 10, 2003, the case was converted to a Chapter 7 proceeding.

MSI filed its second amended proof of claim in July of 2004. As part of that claim MSI sought a percentage of the income generated by TDI based on Grejda's majority ownership. Grejda objected to MSI's claim.

MSI moved for summary judgment on its second amended proof of claim. Both parties briefed the motion.  Thereafter, they entered into a Joint Pretrial Stipulation. Therein, the parties agreed (1) to the material facts stated above, (2) that Grejda failed to devote his full working time and attention to the Medicine Shoppe pharmacy, and (3) to the amount of revenues generated by TDI in the years 1998 through 2002.[2]

The bankruptcy court overruled Grejda's objections in a Memorandum Opinion and Order issued on October 18, 2005.  It allowed MSI's claim in its entirety.

Grejda moved to reconsider, alter or amend the judgment on October 28, 2005. The parties argued the matter in December of 2005. On March 24, 2006, the bankruptcy court issued a second Memorandum Opinion and Order denying Grejda's motion.  Grejda filed a notice of appeal on March 31, 2006.

This is the second time this court has been called upon to adjudicate claims arising from Grejda's creation and operation of TDI.   In *Today's TDI, Inc. v. Medicine Shoppe Int'l*, No. 2:02-cv-2168 (W.D. Pa.) (the "TDI litigation"), MSI filed counterclaims against TDI in tort for

---

[1]Grejda was indicted by a federal grand jury on multiple criminal charges. These charges include eighty-four counts of health care fraud, six counts of mail fraud, fourteen counts of wire fraud, and one count of criminal conspiracy. On June 18, 2007, Grejda pled guilty to one count of conspiracy to commit health care fraud and three counts of health care fraud.  He acknowledged his criminal culpability for the remaining counts charged in the indictment. Sentencing is scheduled for October 19, 2007. *See United States v. Anthony A. Grejda*, 04cr297, W.D. Pa., Docket No.s 217-219.

[2]The revenues generated by TDI were substantial.  According to the joint stipulation, TDI generated in excess of sixty million dollars during the above mentioned years. How much of this revenue was based on fraudulent activity and how much of it may be subject to an order of restitution under 18 U.S.C. §§ 3663 & 3664 are matters to be determined at sentencing. *See id.* at 218.

unfair competition and tortious interference with contract and/or prospective business relations.

Summary judgment ultimately was entered in favor of TDI on MSI's claims. That ruling was based on findings that (1) not a single actual or prospective customer was diverted from the Medicine Shoppe and (2) none of TDI's customers would likely have done business with the Medicine Shoppe as an alternative to the on-line business of TDI. In addition, TDI did not make use of the name or Marks of MSI.

### The Bankruptcy Court Properly Found that Debtor Breached §7.C of the Licence Agreement by Holding an Ownership Interest In and Operating TDI.

Grejda contends his ownership in and operation of TDI did not violate the license agreement. We think otherwise.

As stated by the bankruptcy court, the salient terms of §7.C obligate Grejda or his head pharmacist to:

> devote ... full working time and attention to the pharmacy, which shall be under your ... direct on-premises supervision ... You agree that you ... will at all times exert your best efforts to promote and enhance the business of the Pharmacy, and that you will not engage in any other business or activity that may conflict with your obligations under this agreement.

Additionally, a second clause provided:

> ...[d]uring the term of this Agreement, you agree that, except for the Pharmacy, you will not directly or indirectly own beneficially or of record any capital stock ... in any business which ... operates ... prescription pharmacies within the Territory. You further agree that you will not directly or indirectly actively participate (e.g., as an officer ...) in the management or operation of any business which ... operates ... prescription pharmacies ... within the Territory.

The present matter is one of contract interpretation. The actual terms of the contract and the pertinent material facts are not at issue. The meaning of those terms is in dispute.

Missouri law governs the interpretation of the license agreement as previously noted. Under Missouri law, giving effect to the intent of the parties is one of the cardinal rules of contract interpretation. *Butler v. Mitchell-Hugeback, Inc.*, 895 S.W. 15, 21 (Mo. 1995). Another is that all terms are to be given their plain and ordinary meaning and construed in a manner that does not render other terms meaningless. *City of Harrisonville v. Public Water Supply District No. 9 of Cass County*, 49 S.W. 3d 225, 231 (Mo. App. 2001).

5

No parole or outside evidence may be introduced to establish the meaning of contract provisions in the absence of ambiguity. *Eisenberg v. Redd*, 38 S.W. 3d 409, 411 (Mo. 2001). Ambiguity is not created by the mere disagreement between the parties of what was meant at the time of contracting. Instead, to be ambiguous the meaning of a term must be subject to more than one fair and honest reading. *Dunn Industries Group v. City of Sugar Creek*, 112 S.W. 3d 421, 428 (Mo. 2003).

Grejda contends he was not in violation of §7.C as a result of operating TDI. According to Grejda, that section of the license agreement can be read to prevent only the operating of another traditional walk-in style pharmacy in the territory.

This court's task is to ascribe to the words in § 7.C their plain, ordinary and usual meaning in order to ascertain what was intended by the parties at the time of contracting. The plain and ordinary meaning of §7.C does not support Grejda's interpretation. As we read it, the section also covers an internet-based pharmacy that sells to customers outside the territory if its physical operation is conducted within the territory.

We also hold that the bankruptcy court did not err in finding that Grejda violated §7.C by owning a majority of TDI's stock and by serving as its treasurer and secretary. Section 7.C is unambiguous. Therein, the parties agreed that Grejda would not engage in *any* other business or activity that might conflict with his contractual obligations. He was also expressly prohibited from owning *any* capital stock or *any* other equity interest in *any* business which develops or operates prescription pharmacies within the territory. Additionally, he agreed to refrain from directly or indirectly participating in the management or operation of *any* business which operates prescription pharmacies or pharmacy-related services within the territory.

Furthermore, the language does not draw a distinction between a traditional walk-in pharmacy and one that is internet based. The repeated appearance of the word "any" demonstrates the parties' intent was to create a restriction covering all forms of pharmacies. As the bankruptcy court aptly noted: "debtor's attempt to limit the scope of the unambiguous term "any" as it appears in §7.C is in derogation of its plain, ordinary and usual meaning and is not

6

supported by other provisions of the license agreement." We agree and hold that the language of §7.C did proscribe Grejda's creation, ownership and operation of TDI.

### The Bankruptcy Court Properly Found that §7.C of the Licence Agreement was Enforceable.

Grejda contends that if §7.C is applicable, it is unenforceable under Missouri law because its scope is unreasonably broad, resulting in an unlawful restraint on trade that does not protect a legitimate business interest of MSI. After some initial confusion addressed by the court below, it is clear that §7.C prevented Grejda from competing within the territory but had no affect on TDI's operation as an independent legal entity.

A promise that acts to limit competition or restrict the promisor in the exercise of gainful occupation is a restraint of trade. *Schmersahl Teloar & Co. v. McHugh*, 28 S.W. 3d 345, 348 (Mo. App. 2000). Grejda, as promisor, contractually agreed to limit his right to pursue gainful employment with any other pharmacy during the duration of the license agreement. This amounts to a promise in restraint of trade. Generally, a contract in restraint of trade is unlawful under Missouri law. *Schmersahl*, 28 S.W. 3d 345.

Covenants not to compete are presumptively void as a restraint of trade and the party seeking to enforce such a covenant has the burden of proving it is enforceable. *Armstrong v. Cape Girardeau Physician Associates*, 49 S.W. 3d 821 (Mo. App. 2001). To be enforceable such a covenant must be: 1) necessary to protect a legitimate interest, and 2) reasonable in scope as to time and place. *Schmersahl*, 28 S.W. 3d at 349.

Here MSI seeks to enforce the covenant. Therefore it has the burden to demonstrate enforceability.

We agree with the bankruptcy court that §7.C was necessary for MSI's protection of a legitimate business interest. The license agreement indicated the covenant was needed to protect the confidential elements of The Medicine Shoppe System and to achieve an exchange of ideas among MSI licensees. MSI could reasonably believe that these interests would be hindered if

7

licensees held competitive interests or engaged in competitive activities.

Grejda contends that the identified reason did not prevent him from holding an interest in and operating TDI because TDI was not a "competitive" interest. This argument certainly is not without force. Grejda essentially was servicing customers exclusively outside the geographically restricted area via mail order sales.

However, TDI's situs and potential competitiveness cannot be assessed solely on the basis of customer location. TDI was indeed incorporated in the state of Pennsylvania and its primary corporate address was the basement under the Crafton Medicine Shoppe. The language of the license agreement prevents Grejda from owning *any* stock in a business which "develops or operates . . . pharmacy related services within the Territory." It also prevents him from participating in the management of *any* business that "develops or operates . . . pharmacy related services within the Territory." It is uncontested that Grejda owned stock in TDI. It equally is clear that he acted as TDI's treasurer and secretary. TDI's basement operation physically was located in the epicenter of the restricted territory. Therefore, it seems only appropriate to consider the basement to be TDI's principal place of business. And while there has been no finding of any actual customer diversion by TDI due to its location, this does not retroactively make void MSI's legitimate interest in seeking to prevent a franchisee from operating and managing any pharmacy-related business within the restricted territory.

Section 7.C also was geographically and temporally reasonable. A covenant not to compete will be found geographically reasonable if its restriction reaches only the minimum area necessary to protect the legitimate business interest of the party seeking to enforce it. *Systematic Business Services, Inc. v. Bratten*, 162 S.W. 3d 41 (Mo. App. 2005). Here, Grejda was restricted from operating a pharmacy-related business only in a 1.4 mile radius. This seems exceedingly reasonable in light of the impact of technology in today's society. Additionally, such a covenant must be reasonable as to its time restriction. Here, the parties agreed the covenant would be enforceable only during the life of the license agreement. The duration of the agreement is a reasonable, if not minimal, time restriction in light of MSI's interest in having its licensees

8

devote their undivided attention to developing and running their respective MSI franchises.

It follows that the covenant not to compete was enforceable and Grejda violated it by having an ownership interest in and operating TDI within the territory during the duration of the agreement.

### The bankruptcy court erred in finding that Grejda's bankruptcy estate was liable for an amount equaling 5.5% of the  income generated by TDI.

The bankruptcy court held that Grejda was liable for 5.5% of all income generated by TDI, which totaled $3,998,819.  MSI claimed this amount under the license agreement. According to §6.C of the agreement, MSI is entitled to 5.5% of the "net revenue" generated through the operation of the franchise.

As previously noted, the parties agreed that the term "net revenue" would mean and include (a) the actual gross receipts collected from customers of the Pharmacy or third party payors in relation to goods and services made to those customers, (b) the actual gross receipts collected from any person, whether or not a customer, in connection with sales of goods or services made as a result of any association with or use of the Mark or The Medicine Shoppe system; and (c) any and all other revenues derived through the operation of the Pharmacy.

In order for MSI to establish contractual entitlement to a portion of TDI's revenue under the license agreement, the income generated by TDI  must fall within the language of §6.D.  The language of §6.D identifies three alternative ways in which TDI's income could fall within the meaning of net revenue.  The issues conclusively resolved in the TDI litigation foreclose each of these avenues.

First, the parties agreed that actual receipts collected from or in relation to the sale of goods and services made to customers of the Pharmacy would be net revenue. The referenced Pharmacy was of course  The Medicine Shoppe. Therefore, under this language, it must be shown that TDI's sales were made to or at least were in some way related to customers of The Medicine Shoppe.  The prior TDI litigation conclusively determined that MSI has no evidence to

9

support a finding that any customer of TDI was a customer, or would have been a customer, of The Medicine Shoppe. And even if we were to ignore the legal effect of this determination under the doctrine of collateral estoppel, we would still be forced to reach the same conclusion based upon the information MSI has placed in front of us. Consequently, TDI's income cannot become subject to the 5.5% license fee under this option due to the absence of any link between the customers of The Medicine Shoppe pharmacy and TDI.

Second, the actual gross receipts generated as a result of any association with or use of the Mark or The Medicine Shoppe system qualify as net revenue. Again, the TDI litigation previously determined that no use was made of The Medicine Shoppe name or Marks. In addition, even though TDI sold similar products, it is inappropriate to brand TDI with incorporating The Medicine Shoppe system, as MSI advocates, due to the markedly dissimilar business models employed by each pharmacy. There is nothing in the record beyond mere physical proximity to support such a contention. And the dissimilar business models make such a position an unwarranted leap of logic that amounts to nothing more than an exercise of retribution. Of course, the integrity of this institution prohibits it from awarding MSI a "cut" of TDI's income based on such an exercise.

Finally, all other revenue derived through the operation of the Pharmacy is defined as net revenue. This language also presents a roadblock for MSI's effort to recover a cut of TDI's income. The sales of TDI cannot sufficiently be linked to The Medicine Shoppe so as to classify them as being earned through its operation. The sales of TDI existed independently from the operation of the Pharmacy. Every facet of TDI's operation, down to its mailing address, was separate and distinct from The Medicine Shoppe. The mere fact that TDI operated out of the basement of property leased by Grejda to operate his Medicine Shoppe pharmacy is insufficient to sustain a finding that TDI's revenues were derived through the operation of the Pharmacy. The term "the Pharmacy" as used by the parties must be given its clear and intended meaning. Had the parties used the word "premises" instead of the word Pharmacy in the license agreement our view might well be different. But, we are obligated to define each party's contractual rights by

10

applying the terms agreed upon at the time of contracting.

As explained above, the income generated by TDI as an independent corporation does not fall within the ambit of the term "net revenues" as defined in the license agreement. In order to overcome this obstacle, the bankruptcy court held that Grejda's bankruptcy estate was liable for the full amount of a net revenue cut because Grejda and TDI were essentially one and the same. In other words, by disregarding the corporate form and treating Grejda and TDI as a single legal entity, the bankruptcy court was free to find that the income generated by TDI should be attributed to Grejda as franchisee of MSI. The approach eliminated any obstacles created by the net revenue language of §6.C. Since the income of TDI then fell within the net revenue language, the bankruptcy court awarded MSI its full 5.5% cut on the theory that Grejda contractually was obligated to pay that amount under the terms of the license agreement.

In order to affirm the decision below, there must be a legal basis for the bankruptcy court to disregard TDI's corporate existence and treat it and Grejda as one.

There are of course legal doctrines which authorize a court to disregard the corporate entity. It is necessary to determine whether the bankruptcy court can be affirmed under any of these legal doctrines. Before turning to that undertaking, however, it is necessary to identify the source of governing law. On this matter there seemingly appears to be a disconnect between the parties and the bankruptcy court. The bankruptcy court apparently applied the law of Missouri, citing only Missouri cases, while both parties cite case law almost exclusively from Pennsylvania. Consideration of the pertinent factors indicates that Pennsylvania law controls the validity of TDI's corporate existence.

The parties have contractually agreed that their relationship is governed by the laws of Missouri. And thus in matters of contract construction we are bound to apply Missouri law. The issue of whether TDI's corporate existence should be set aside is a distinct matter, however, the determination of which should be reviewed independently from claims arising under the parties' contract. To begin with, the corporation whose separate existence is at issue, TDI, was not a party to the license agreement and, therefore, never contractually agreed to be bound by Missouri law.

11

Moreover, a federal court sitting in Pennsylvania must look to the law of Pennsylvania for choice of law. *LCI Communications, Inc. v. Wilson,* 700 F. Supp. 1390,1396 (W.D. Pa 1988). When faced with the issue of setting aside the corporate entity, Pennsylvania courts generally recognize the law of the state of incorporation as controlling. *In Re Asbestos Litigation,* 1993 WL 209719 (E.D.Pa). TDI was incorporated in Pennsylvania and physically operated within its borders. Additionally, using the state of incorporation's law would lead to a result congruent with the flexible contacts/interests analysis Pennsylvania adopted in *Griffith v. United Airlines, Inc.,* 416 Pa. 1 (Pa. 1964). Pennsylvania's dominant interest in this case is clear since virtually all of the corporate conduct in question occurred there.

Equally compelling is that both parties, by citing Pennsylvania case law in their respective briefs, seem at least tacitly to have agreed that Pennsylvania law applies.[3] In light of these factors, the principles of Pennsylvania law appropriately are considered in determining whether TDI's corporate entity should be disregarded.[4]

In Pennsylvania, there are two main principles under which a court may disregard the corporate entity and hold a shareholder liable for the corporation's actions. The first is commonly referred to as "piercing the corporate veil." The second is known as the participation theory. We will analyze the facts under each theory to determine if TDI's corporate existence should be set aside.

As a starting point, it is well settled that a strong presumption exists against piercing the corporate veil. *Good v. Holstein*, 787 A.2d 426, (Pa. Super. 2001). Also, "the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." *Good*, 787 A.2d. at 430.

Beyond the presumption against piercing its corporate veil and the general rule in favor of

---

[3]The appellee's brief expressly conveys its belief that Pennsylvania law should be applied.

[4]Although we take the opportunity to clarify why Pennsylvania law governs this issue, it is not of material significance to the final determination at hand. Missouri and Pennsylvania law essentially reflect the same basic principles in this area.

12

treating a corporation as a separate legal entity, there is no talismanic formula or well established rule that determines exactly when the corporate veil can and should be pierced. There are, however, certain factors that the courts routinely consider in determining whether the corporate entity should be disregarded. These include: 1) undercapitalization, 2) failure to adhere to corporate formalities, 3) substantial intermingling of corporate and personal affairs, and 4) use of the corporate form to perpetrate fraud. *Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC*, 846 A.2d 1264 (Pa. Super. 2004). Consideration of these factors can result in the corporate veil being pierced on an "alter ego" theory.

The "alter ego" approach appears to be the theory utilized by the bankruptcy court. It neither expressly stated that it was piercing the corporate veil nor mentioned the alter ego theory. However, it relied on *21 West, Inc. v. Meadowgreen Trails, Inc.*, 913 S.W. 2d 858 (Mo. App. 1995), for the proposition that "the corporate fiction may be disregarded when justice so requires." *21 West* cited *Community Title, Co. v. R.T. Crow*, 728 S.W. 2d 652 (Mo. App. 1987), which held that the corporate cloak should be disregarded when it would otherwise justify a wrong. The case relied on by the *Community Title* court grounded the justice-based exception in the doctrine of piercing the corporate veil. In *Krajcovic v. Krajcovic*, 693 S.W. 2d 884 (Mo. App. 1985), the court explained:

> under the *alter ego* or instrumentality rule when a corporation comes under the domination of a person as to have become a mere instrument of that person and is really indistinct from the person controlling it, then the corporate form will be disregarded if to retain it results in *injustice.*

*Krajcovic*, 693 S.W. 2d at 887 (emphasis added). Although the bankruptcy court did not reference piercing the corporate veil under an alter ego theory, the rationale of *Krajcovic* demonstrates that the principles of this doctrine essentially constitute the underpinnings of the law it relied upon to support its determination.

Although the bankruptcy court utilized Missouri case law routed in alter ego theory, the operative principles virtually are identical to Pennsylvania law. The four factors used by Pennsylvania courts to determine whether the corporate veil should be pierced are consistent with

13

Missouri cases generally applying the "alter ego or instrumentality" doctrine. Because these factors in essence informed the bankruptcy court's determination, consideration of them is appropriate in review of its determination.

The first three factors clearly do not a provide any support for disregarding the corporate existence of TDI. No argument has been made and none is sustainable that TDI was undercapitalized. The record also indicates that TDI adhered to corporate formalities, at least to the extent that its shareholders should not be liable for failure to do so. Additionally, it cannot be said that there was a great commingling of corporate and personal assets and affairs. Grejda did not use corporate accounts to pay personal debts or obligations. He treated and handled the affairs of the corporation separately. Since the first three factors provide no substantial support for the bankruptcy court's decision, the propriety of its determination is dependent on the fraud factor.

The extraordinary step of disregarding the corporate entity under a fraud-based veil-piercing theory generally is appropriate only where it is clear that there has been a fraudulent conveyance or the corporation itself has been created as a mere sham or fraud. See e.g. *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.* 919 F.2d 206, 214 (3d Cir. 1990). Every conveyance or transaction made with the actual intent to hinder, delay or defraud present or future creditors is fraudulent. Fraudulent conveyances of this nature generally can occur where a parent corporation or sole shareholder owns multiple corporations. If one of the subsidiary corporations becomes exposed to a liability it cannot afford to satisfy, a way to defeat the liability is to transfer the assets of the exposed subsidiary to another subsidiary or the parent corporation. Under these circumstances, without the remedy of piercing the corporate veil, the creditor would be left without a remedy and would have no way to recoup what is otherwise rightfully owed to it. The doctrine thus allows an existing creditor to defeat the limited liability protection a shareholder usually enjoys when a fraudulent act has been committed by the shareholder specifically to prevent the creditor from recovering. The doctrine is not in and of itself a cause of action, but is merely a means by which liability can be imposed on a shareholder who otherwise

14

could not be held accountable for the underlying liability or cause of action and has misused the corporate entity in an effort to defeat that liability. *Peacock v. Thomas*, 516 U.S. 349, 354 (1996).

This case does not involve a fraudulent conveyance. There was no conveyance of assets from one corporation to another. Instead, the bankruptcy court concluded that the creation of TDI itself was the act of fraud.

The apparent evidentiary basis for the bankruptcy court's determination was a form, not signed by Grejda, that was submitted to the Pennsylvania Bureau of Registration. It omitted reference to Grejda's ownership interest in TDI and wrongfully attributed his shares to other individuals. Based on this form the bankruptcy court reasoned that TDI was incorporated for the "sole purpose of cheating MSI out of licence fees." [5]

---

[5]Through a motion to supplement the record with newly discovered evidence, appellee seeks to expand the record to include the testimony of Grejda's partner in TDI, and paramour during the days of its operation, Lisa St. Peter. Ms. St. Peter was charged in the criminal indictment at *United States v. Anthony A. Grejda and Lisa St. Peter*, 04cr297 W.D. Pa., agreed to plead guilty, and testified during the trial that proceeded prior to Grejda's decision mid-trial to plead guilty. In her testimony she stated in passing that one of the reasons TDI was incorporated was to avoid having to pay any license fees to MSI. Her testimony also echoed and corroborated the factual findings in the TDI litigation: that TDI was a mail order business focused on dispensing medication to AIDS patients in numerous states and that the orders were shipped after being filed at TDI. The testimony was quite consistent with the conclusive factual findings in the TDI litigation that (1) not a single actual or prospective customer was diverted from the Medicine Shoppe and (2) none of TDI's customers would likely have done business with the Medicine Shoppe as an alternative to the on-line business of TDI. Ms. St. Peter's testimony further indicated that the true ownership of TDI was concealed on a number of states' licensing forms and pharmaceutical agreements.

Appellee's motion to supplement the record must be denied. It is well settled that the Rule permitting expansion of a record on appeal is designed " to permit correction or modification of the record transmitted to the [reviewing court] so that it adequately reflects what happened in the [court below]." *United States ex rel. Mulvaney v. Rush*, 487 F.2d 684, 687 n. 5 (3d Cir.1973). Consideration of "newly discovered evidence" on appeal is reserved for truly extraordinary circumstances, "such as those that render the case moot or alter the appropriateness of injunctive relief, a change in pertinent law, or facts of which a court may take judicial notice." *In re Application of Adan*, 437 F.3d 381, 388 n.3 (3d Cir. 2006) (citing in support *Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 370 n. 7 (D.C. Cir.1978) (per curiam)); *see also Gagliardi v. Kratzenberg*, 188 Fed. Appx. 86, 88 n.3 (3d Cir. 2006) (same). No such circumstances are present. Even assuming for argument's sake that the information was not

In Pennsylvania, a finding of fraud must be based on clear and convincing evidence. Here, the documents informing the bankruptcy court's assessment do not bear Grejda's signature. Others were shareholders in the corporation and presumably involved in its creation. Such dubious evidence obviously falls well short of proving by clear and convincing evidence that TDI was created for the sole purpose of defrauding MSI out of license fees.

Notwithstanding the bankruptcy court's insight into the shareholders' motives for creating TDI, it is equally plausible that TDI was created not for the sole purpose of cheating MSI out of license fees, that, absent the creation of TDI would not even exist, but to reach a national market not available through the Medicine Shoppe System in order to generate greater revenues. In that event, any omission that may have been committed from not properly reporting ownership interests in a corporation would be limited to an attempt to avoid detection of a breach of the ownership and participation covenants in the license agreement. It would not support an inference of any intent to divert competition or misappropriate customers of the Medicine Shoppe or even of the Medicine Shoppe system. And the conclusive factual determinations from the prior TDI litigation inescapably support just such a conclusion. In other words, any fraud by Grejda in reporting the ownership of TDI was designed to avoid loosing the ability to continue operating the Crafton Medicine Shoppe, and not to deprive MSI of customers or divert revenue from the operation of the Medicine Shoppe. At the very least, TDI necessarily was created for a legitimate purpose and it cannot be said that the corporation itself was created as a mere alter ego of Grejda solely to perpetrate a fraud against his personal creditors.[6]

---

available to appellee at an earlier date that would have permitted its inclusion for the Bankruptcy Court's consideration, Ms. St. Peter's testimony does not render the case moot, alter the appropriateness of injunctive relief or reflect facts of which this court can take judicial notice. Nor does it otherwise arise in a context that can be deemed extraordinary circumstances.

[6]Ms. St. Peter's testimony is not to the contrary. While it may have been Grejda's intent to avoid paying a licensing fee to MSI when TDI was first formed, it cannot be disputed that the TDI litigation conclusively established that no customer or potential customer of MSI was diverted from the Crafton Medicine Shoppe due to the nature of TDI's customer base and its mode of operation. Ms. St. Peter's testimony merely confirmed the reasons why MSI did not lose actual

Because any fraud by Grejda did not involve a use of the corporate form itself to deprive MSI of customers or revenue, a factual determination which MSI cannot deny, the fraudulent or misleading records of corporate ownership do not provide a sufficient predicate for piercing the corporate veil. To warrant such treatment a corporation virtually must be a complete sham with no valid or legitimate purpose. This premise is demonstrated by *Official Comm. Of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001). There, the Third Circuit held that a corporation's existence could not be disregarded even though a corporation's sole shareholder and officer used the corporation to commit a fraud. The court reasoned that the corporate veil could not be pierced because the corporation was not fictional or a sham, corporate formalities were not ignored, and the corporation did not lack an identity separate from the sole shareholder. *R.F. Lafferty & Co.*, 267 F.3rd at 354.

As in *Lafferty*, this case simply does not involve the corporate *form* being used to perpetrate a fraud on MSI per se. *accord Advanced Tel. Sys., Inc. Com-net Prof. Mobile Radio, LLC*, 846 A.2d at 1278 (the corporate form must be instrumental in perpetrating the fraud to warrant piercing the corporate veil). This proposition is adequately supported by the observation that MSI would stand in no better position had Grejda entered into a partnership agreement instead of incorporating TDI. The corporate form itself is not MSI's obstacle to recovery. To the contrary, its inability to establish tort or contractual liability for monetary damages proximately caused by TDI's sales reflect the direct impediment to its desire to gain a share of TDI's revenue or a "superior" cut to its illegal gains. Under such circumstances it would be improper to use a veil piercing theory to create liability in a shareholder where none exists against the corporation for the creditor in the first place.

The doctrine of piercing the corporate veil is available so certain creditors may impose

---

business to the operation of TDI. Thus, even if the proposed testimony were to be considered, it would do nothing more than reiterate that Grejda had the intent to hide his ownership interest in TDI from MSI and intended to avoid any obligation to pay license fees to MSI from TDI's operations, matters which the court has taken into account in its resolution of this bankruptcy appeal.

liability on an existing claim that they would otherwise be unable to pursue due to the "limited liability" nature of corporations. Since all of the factors warranting such relief are absent and MSI would be in an identical position had Grejda engaged in the same activities via a partnership, the doctrine of piercing the corporate veil is inappropriate.

MSI, apparently anticipating the shortcomings of such an approach, argues that the bankruptcy court did not apply a veil piercing theory in its determination of this matter. Instead, it contends that under the "participation theory," which is recognized in Pennsylvania law, Grejda should be held individually liable for his own misconduct and should not be permitted to "shield himself behind a corporation when he is an actual participant in the unlawful conduct."

As an initial matter, it must be observed that like the veil-piercing theory, the participation theory "is not a cause of action in and of itself, but rather a form of derivative liability." *Eastern Continuous Forms v. Keybis Corporation*, 302 B.R. 320 (2003). Therefore, the participation theory may only be used to impose liability arising from some other wrongful act and cannot be used to create liability where it does not otherwise exist.

The participation theory recognizes that shareholders are to be held accountable for their personal actions when they knowingly participate in a wrongful or unlawful act of the corporation. It prevents shareholders from escaping from individual liability for personal action because their actions were undertaken on behalf of a corporation. This theory is well established in Pennsylvania law. See *Wicks v. Milzoco Builders, Inc*., 503 Pa. 614 (Pa. 1983) (Under participation theory, liability is not predicated on findings that a corporation is a sham and mere alter ego of individual corporate officer, rather, liability attaches where the record establishes an individual's participation in tortious activity.); *Eastern Continuous Forms*, 302 B.R 320 (2003), ("Under participation theory of liability, which, under Pennsylvania law, allows corporate officers to be held liable for participating in a corporation's wrongful acts, liability is imposed on corporate officer as an actor, rather than as owner."); *Commonwealth v. Manson*, 903 A.2d 69 (Pa. Commonwealth 2006), ( "the general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor.")

18

The participation theory generally has been applied to scenarios involving intentional tortuous conduct. MSI, however, observes that there have been circumstances in which a contract-based claim can support a finding of derivative liability under the participation theory. It cites *Eastern Continuous Forms, Inc. V. Liechtenstein,* 302 B.R. 320 (E.D. Pa. Bankr. 2003), in support of its position that the instant matter also should be subject to a participation theory analysis.

MSI's reliance on *Eastern Continuous Forms* is misplaced. That case dealt with an asset purchase agreement between two companies. The seller corporation was owned by the defendant/sole-shareholder. Pursuant to the agreement, various warranties and representations were made by the seller/sole-shareholder about the value and status of clientele. The seller/sole-shareholder had knowledge before entering the agreement that the largest client, representing roughly twenty-eight percent of the business, was in financial ruin and would likely discontinue his business with the seller's company in the near future. The seller/sole-shareholder did not disclose this information and it was suggested that steps were taken to prevent buyer from obtaining this knowledge. The sole shareholder was held to be jointly and severally liable for the damages suffered by the buyer due to breach of warranties and representations in the asset purchase agreement. It also was recognized that promises to make disclosures were attributable to both the selling corporation and the defendant personally. Because the court found the defendant personally responsible for some of the representations made on behalf of the corporation, personal liability was imposed under the participation theory.

The liability imposed on the corporation and the defendant in *Eastern Continuous Forms* was joint and several. This, of course, required the corporation itself to have made the misrepresentations and the defendant to have individually participated in making those misrepresentations. Here, TDI was not even in existence at the time Grejda and MSI entered into the license agreement. Thus, there was no active misrepresentation at that time. The only misrepresentations by Grejda occurred years later and were not directed to MSI or causally instrumental in the deprivation of its property or revenue. Furthermore, the participation theory

19

would be applicable only if TDI, as a corporate entity, had committed a wrong or tort in which Grejda participated.

Grejda's violation of his contractual relationship with MSI by working for and owning shares in TDI does not transform TDI's business transactions into wrongful conduct against MSI. Any wrongdoing was in Grejda's breach of his non-compete clause and damages must be causally connected to that breach.

It conclusively has been established that TDI did not commit any tortious or wrongful acts toward MSI.   Consequently, it would be improper to use the participation theory to hold Grejda responsible for non-existent corporate liability.

MSI did not prove entitlement to 5.5% of all revenues generated by TDI under the license agreement or any other viable theory of liability.   Furthermore, neither piercing the corporate veil nor the participation theory are appropriate mechanisms from which to attribute the revenue earned by TDI to Grejda personally.  It follows that the bankruptcy court erred in allowing MSI's second proof of claim in the full amount.

### Principles of Contract Law and Public Policy Support the Determination that MSI is not Entitled to Recover an Amount Equal to 5.5% of TDI's Net Revenues from Mr. Grejda Personally.

As a general matter, MSI second proof of claim sought entitlement to MSI's standard revenue fee under the license agreement for the sales made by TDI. This position necessarily assumes liability exists for the recovery of such damages. Two general avenues for such a recovery exit: contract or tort.

MSI has failed to identify any viable basis in contract law to support its claim to a revenue "cut" on TDI's sales. Grejda's breach of the license agreement does not provide an avenue for MSI to reach TDI's earnings.

It is a long established principle of contract law that the proper measure of damages for breach of a covenant not to compete is the non-breaching party's losses and not the breaching party's gains. *See* *e.g., Weiss v. Wiederlight*, 546 A.2d 216 (Conn. 1988); *Peltz v. Eichele*, 62

20

Mo.171 (Mo. 1876). As the *Peltz* court observed: "the measure of damages for breach of a covenant not to engage in a business . . . is what the latter has lost by the breach, and not what the seller has gained thereby." *Peltz*, 62 Mo. 171. And while profits made by the seller may be admissible, their use is only relevant to the question of "the extent of the diversion of business from the buyer." *Id.*

Moreover, to be recoverable, the amount of loss to the non-breach party, if any, must be quantifiable to a reasonable degree of certainty and proximately caused by the breach. *Id.* Remote and consequential damages are not recoverable, nor are punitive damages. *Id.*

MSI has suffered no actual quantifiable damages for which it is entitled to monetary damages. It was conclusively determined in the TDI litigation that there had been no diversion of customers from the Medicine Shoppe or exploitation of MSI's marks or system. There is no evidence in the instant record or from the TDI litigation to support any claim that profits were lost by MSI. Therefore, in the absence of such evidence, MSI cannot receive an award on the basis that it lost profits or suffered a diminution in value as the proximate result of Grejda's breach of the various provisions of the covenant not to compete.[7] Its proper remedy would be termination of the franchise and/or enjoining Grejda from operating TDI as a ongoing concern. MSI has failed to advance any basis in tort or contract to support the contested portion of its second amended proof of claim. The mere fact that Grejda's actions were something less than scrupulous does not entitle MSI to share in revenue that conclusively has been determined to be beyond the terms of license agreement. Because no viable theory exists for recovery of the fees MSI seeks in tort, contract or equitable principles, the order of the bankruptcy court awarding

---

[7]The bankruptcy court opined that there is no reason to think Grejda could not have made TDI's sales through the Medicine Shoppe. We disagree. Even overlooking the repercussions from the fact that Grejda was indicted by a grand jury on more than one hundred counts of fraud in relation to TDI's business and entered a plea of guilty to four of those counts, with acceptance of criminal culpability as to the remaining counts, thereby creating the potential for an order directing that all unlawfully gained property be returned as restitution, *see* 18 U.S.C. § 3663A(b)(1)(A), the conclusive factual determinations in the TDI ligation sufficiently undermine any such inference.

21

MSI $3,998,819 must be reversed.[8]

For the reasons set forth above, appellee's motion to supplement the record on appeal will be denied and the Bankruptcy Court's orders of October 18, 2005, and March 24, 2006, will be reversed in so far as they awarded appellee $3,998,819 in connection with Grejda's operation of TDI. Appropriate orders will follow.

Date: _September 21, 2007_

_DS Cercone_
David Stewart Cercone
United States District Judge

cc:    Paul A. Manion, Esquire
        James R. Walker, Esquire
        Manion McDonough & Lucas
        Suite 1414
        600 Grant Street
        Pittsburgh, PA 15219

        David Porter, Esquire
        George Cass, Esquire
        Buchanan Ingersoll PC
        One Oxford Centre - 20th Floor
        301 Grant Street
        Pittsburgh, PA 15219

        Stanley G. Makoroff, Esquire
        Blumling & Gusky LLP
        1200 Koppers Building
        436 Seventh Avenue
        Pittsburgh, PA 15219

---

[8] Magistrate Judge Caizza made a good point in observing that "fairness considerations would suggest that Medicine Shoppe's desire to share in the fruits of TDI's labors should be accompanied by its willingness to share in the potential liabilities." July 14, 2005, Report and Recommendation (Doc. No. 74) in _Today's TDI, Inc. v. Medicine Shoppe International, Inc._, 2:02-cv-02168 at 9. It is highly unlikely that MSI would extend such an effort to make a connection between its and TDI's revenue if it instead were being called upon to pay restitution or indemnification for Grejda's undertakings.

Kathleen Robb
United States Trustee
Liberty Center, Suite 970
1001 Liberty Avenue
Pittsburgh, PA 15222